May it please the court. Good morning, your honors. My name is Jesse Bowling. I'm a UCLA law student here with the Ninth Circuit Appellate Clinic. My colleague, Aaron Spiewak, and I are pro bono counsel for Mr. Jimenez in this cause of action. Lean in. Why don't you just lift the mic a little bit. You're doing fine. We all had to go through this. Thank you, your honors. We'd like to reserve one minute for rebuttal. And furthermore, I will be handling the First Amendment and Eighth Amendment claims, while my co-counsel will be handling the due process claims. All right. You've got 10 minutes, so be efficient. Your honor, my client filed a prison grievance. In response, a prison official came up to him and threatened to make him sit and rot in administrative segregation. Under our circuit's precedent in Brodheim, this is clearly retaliation. The district court got this wrong, and this issue should be reversed and remanded for further inquiry. Secondly, your honors, there's ample evidence in the record that suggests this threat was actually carried out. Specifically, this prison official who threatened my client, he had the ability to make sure my client stayed in administrative segregation. Can you explain exactly how that happened, how Officer Drain continued to cause Mr. Jimenez to be in continued detention? He claimed he didn't have the authority to keep him there. How do you tie Officer Drain to Mr. Jimenez? Well, the record shows that Mr. Drain, in this case, he engaged in specific job responsibilities that included determining whether my client should stay in administrative segregation. For example, he, along with another prison official, he basically sat down, and they determined at one point that Mr. Jimenez should stay there. Although I'd like to be candid and note that this occurred before the threat happened, I believe this evidence is strong enough to link him to my client and give him the ability to actuate his threat. Did he have the full authority to keep him there, or did somebody else have to make a decision? From my understanding of the record, the decision-making process was not in his sole capacity. But from what I understand about First Amendment retaliation, it's not necessary for it to be the sole decision-maker in this case. I believe that being a part of a group is enough to constitute an adverse action under this standard. So could I just ask you, what's your best evidence that he was part of the group? I guess there's three things, Your Honor. First, there's evidence that his job responsibilities, like I've stated, connected him with my client and the determination. Second, we have motive. So he went up to my client and threatened him to make him sit and rot in administrative segregation. And third, we have the effect. So my client did stay in administrative segregation for almost three years. I believe these three pieces of evidence, both effect, motive, and opportunity, all point to the inference that my client was retaliated against. But I'm asking a different question. My question is, what's your best evidence that Drain was actually part of the group that made that decision? Are you relying on the circumstances that you just identified? Exactly, Your Honor. My case is admittingly circumstantial, but I believe in this situation it's enough to pass summary judgment. Thank you. Lastly, I'd like to talk about the Eighth Amendment claim. My client received bleeding, incurred bleeding lacerations while he was in prison. These wounds caused him a great amount of pain. In response, he filed an emergency medical grievance in order to receive same-day care. On this grievance, the governing prison official at that time decided that my client did not deserve medical treatment at that time. And specifically, he noted that he believed the reason for denying my client medical care was because he thought my client incurred the lacerations himself, self-inflicted wounds. I believe in our circuit we've held in a case Hunt that something like tooth pain, which incurs over a period of time, is enough to get over the Eighth Amendment hurdle. And I think when you compare our case to this, it's equally as persuasive. In addition, there's no denying that the prison official in this case, Scheel, knew about the injury and furthermore denied medical attention that day and delayed my client's medical care for over two weeks. So your theory is even if he inflicted the wounds himself, he still was entitled to treatment? Well, I think the Eighth Amendment standard doesn't take into consideration how the wounds were affected. Only the severity of the wounds. The standard, you need a serious injury that causes further harm. And in this case, you know, whether my client inflicted those wounds on himself or his story, which is he was cut by his restraints, whichever is true, the injury still occurred. And, you know, if a prisoner is bleeding, he needs medical attention. I'll take that as a yes. Yes, Your Honor. I apologize. That's all right. Could I just ask a clarifying question? My understanding is that a serious medical need exists if the failure to treat could result in either further significant injury or unnecessary and wanton infliction of pain. Which are you relying on? That the failure to treat was going to cause additional injury or pain? I would say that under the way you've stated the standard, it's the second one. Further pain constitutes deliberate indifference under the standard. For example, in the case Hunt, it was the pain that the prisoner had. He lost his dentures and they were not replaced. And so the pain from eating food without his dentures and et cetera was considered sufficient. Was there anything in the record that tells us that this individual was required to continue walking and leg restraints? Is that what was causing further pain? I believe the further pain in this situation were his injuries. His injuries after a couple weeks resulted in scars. So it's the further pain caused by the initial injury. If that answers your question. Okay. I would like to yield the rest of my time to my co-counsel to talk about the due process claims. Thank you, Your Honors. Thank you. And I'll give you a minute for a rebuttal if you need to. It depends on whether the other side throws in a towel. May it please the Court. My name is Aaron Spiewak. I'll be addressing the due process claim for Mr. Jimenez. This Court's decisions establish that when a prison official validates a prisoner as a member of a gang, that they are required to support this decision with some evidence. And the reasons behind this are to guard against arbitrary decision-making by prison officials. In our case, my client was validated on March 21, 2000, as a member of a gang with no evidence. And this is an example of the type of arbitrary decision that this Court's precedent has established to guard against. Now, defendants have put into the record what they consider to be a few pieces of evidence. I'd like to address those in brief. The first, defendants point to several instances on grievance forms, prison grievance forms. Before you get there, what's the liberty interest that you're relying on here? First of all, let me clarify. You're challenging his classification, correct? That's correct. As a security threat? That's correct. Okay. And what's the liberty interest in the classification? The liberty interest as recognized in Bruce V. Hill's, in the circuit. Where does it say that? It does not recognize a liberty interest. It states that based on the U.S. Supreme Court's decision and Superintendent V. Hill, that due process is owed to this type of administrative decision-making by a prison official. What was the decision-making at issue there? In Superintendent V. Hill? Yeah. The decision that was made was to revoke good time credits of a prisoner. So what's the decision here? This decision was to, as recognized in Bruce, to validate my client, to validate a prisoner as a member of a gang. And that was the intent. Where is that established? In Bruce? In Bruce V. Hill. Bruce was in administrative segregation, wasn't it? No, Your Honor. In Bruce, they were challenging the decision, not the placement into administrative segregation. But Bruce came down in 2003. Jimenez's gang validation was in 2000. So how can you argue or can you argue that the due process right was clearly established at the time of Mr. Jimenez's case? Thank you, Your Honor. The issue of qualified immunity, which I think this, your question may go to, was not addressed by the district court. We don't feel it's appropriate to address that on appeal for the first time. It's an issue that should be remanded with the due process claim and then considered by the district court. I guess my question is, if we were to reach qualified immunity, why should we find the due process right clearly established? Thank you, Your Honor. In this Court's case in Tucson, it discusses that administrative decisions like this are that there is some sort of, as they call it, some evidence required to support these administrative decisions, that though they do not rise to the level of disciplinary proceedings, for instance, that they are still concerns, that there's still arbitrariness concerns that come along with these type of decisions. And qualified immunity would shield the defendants from monetary damages. Isn't that true? If they were entitled to qualified immunity, Your Honor, that may be true. Yes. I have one follow-up question on mine. Bruce talked about the administrative segregation and said in that case that the administrative segregation did not constitute atypical and significant hardship. In this case, the classification of your client happened several years before he was placed in administrative segregation. So is your theory that you can derive from Bruce the principle that the mere classification without any immediate consequence is itself a liberty interest? Yes, Your Honor, and I believe that in Bruce their discussion of what has been called atypical confinement was separated from their discussion of the classification. The classification, as it was discussed in Bruce, yielded the classification in our case had it occurred subsequent to his altercations in prison as opposed to the way it did. Let me read why I'm having trouble. It says, citing Sandin v. Conner, it says, Sandin, however, articulated a new requirement for recognizing federal due process liberty interests of inmates subject to administrative segregation. Segregation ordinarily must rise to the level of atypical and significant hardship in relation to the ordinary incidence of prison life. And then it goes on to talk about his administrative segregation. In this case, the classification occurred. There was no administrative segregation until many years later. Isn't that correct? That is correct. So how does the liberty interest arise at the time of the mere classification? We are not addressing atypical confinement. I do believe that Bruce talks about the placement in administrative segregation separate from their discussion of the due process. I read you what they characterized Sandin. Yes, Your Honor. Are you reading Bruce to say or to read Sandin to say that because a classification of this nature exposes him to administrative segregation, he has a liberty interest in the classification? No, Your Honor. I read Bruce as to speak solely to the classification, that it is the type of administrative decision that affects a prisoner's standing, if you will, or his life in prison. And that's the type of decision that I read Bruce to be addressing in requiring due process, not the placement in administrative segregation. Okay. All right. Thank you, Your Honors. Good morning, Your Honors. My name is Clark Leslie. I am the attorney who has the privilege of representing the appellees in this matter. I'd like to compliment my young colleagues. I remember my first appearance where, as I stood up, I spilled my glass of water all over my papers. So they're already doing much better. I did consider waving the white flag, but I came all the way here from Nevada, so I thought I'd give it a shot. You're very kind. We appreciate it. Will you pull the microphone a little closer to you and speak up? Yes, Your Honor. Is that better? That's better. Thank you. Your Honors, at the end of the day, when we look at this case, there are four reasons why Mr. Jimenez remained in administrative segregation. First of all, as you know from the facts, there had been not one, not two, but three assaults that he had been engaged in, the third in September of 2003, which finally placed his objective risk factor score above that upon which he would be required to enter into administrative segregation. Could I ask you a question about that? Would his risk factor score have qualified him if he hadn't been designated as someone who was affiliated with a gang? The risk factor score, as Your Honor knows, is an objective scale which takes into account the activities of an inmate. Is he involved or is she involved in a gang? Is he or she engaged in drug use? Are they engaged in assaults? And they simply add the points up. Although he had been validated in 2001, as you know from the record, he had remained in general population until that third assault, which put his RFS above the level upon which he could remain at minimum or medium security. At that point, there was no choice. And that is one of the things we wish to really emphasize to this Court. There was nothing that Caseworker Drain could do. As a matter of fact, as was admitted by my honorable opponents, Drain was trying to find a way to get him to be transferred to Lovelock Correctional Center. So could I just get you to, before you go on, and I apologize for interrupting, but the answer to my question then is yes? Do you remember what my question was? I thought I had answered it. Please rephrase it again, Your Honor. My question was just, you described that after the three assaults, then his risk factor score was enough that it put him over the limit. And my question is, would that have been the case had he not been qualified as a gang member? Yes. The three assaults alone put him above the RFS, sufficient to put him at a level where he would have been a maximum security, because the last of the assaults was upon a correctional officer. Okay. So what I understood you to say the first time, in response to my question, was that there is a whole bunch of factors that are considered, and one of them is whether or not this person is affiliated with the gang. So now I'm left not knowing whether or not that put him over the edge. And in direct answer to your question, when he was validated in 2000, he didn't have a sufficient risk factor score. When he engaged in the first two assaults with the Norteños against him, he still hadn't maxed out in terms of changing his status. When he engaged in that third assault against the correctional officer, that put him above and beyond. If your question is – Excuse me, Counselor. Behind this, before the year 2000, was there any evidence that he was a gang member? No. Or what was it? There was none. There was none. So as of 2000, it's simply the assaults that are putting him at this risk level? Is that – Prior to 2000, he had a pretty run-of-the-mill record, nothing really serious. 2000, the Inspector General's Office, as you know, validated him as a gang member. After that, beginning one in 2001, one in 2002, and then one in 2003, the series of assaults occurred. So it was in September of 2003 when the final assault occurred against the correctional officer that he exceeded the RFS level. But we also know, Your Honors, that the district court was extremely impressed with the fact that there were other factors that led to him remaining in administrative segregation that had nothing to do with what Correctional Officer Green did. First of all, he had been given an opportunity to come forward and explain the reason and the rationale and the motive behind the assaults. He wouldn't even come forward and say, I don't know what they were. He simply clammed up. Secondly, it was apparent after the other two assaults on him, as well as the validation, that he was in danger. And as you know, the prison has a responsibility to protect its inmates. And third, he was refusing to engage in the processes by which an inmate can challenge his or her classification and prove that he or she is not a properly validated gang member. That may be true, Counsel, but didn't Drain make a threat that said, I will, in effect, make sure you wind up in administrative segregation? Why doesn't that create an issue of fact that needs to be litigated, not resolved on summary judgment? Permit me the frustration of the defense counsel in that many times these things are stated as being absolutely true. I know we have to consider them as true. I didn't say it was absolutely true. I said we're on summary judgment, as you know. Right. Assuming that statement was made, in the Ninth Circuit, it is correct that Brodheim states that a simple threat may constitute an adverse action for purposes of proceeding. But we also know, Your Honor, that the week prior, he and Officer Endel had been making efforts to get him transferred. We also know, very importantly, that the timeline, which was of significance in Brodheim, is also of significance here. The alleged, or we will take as a fact, the threat that I'll let you rot in segregation until you get out, was purportedly made in the beginning of May. The grievance against Drain's son-in-law, I mean this statement wasn't even, there wasn't even a direct relationship, but in any event, the grievance was filed on May 17th and it was denied on May 25th. The motive, if any, had a shelf life of about 10 days. So whatever would have motivated Officer Drain, given every possible inference to the appellant in this case, came and went in an extremely short period of time. So we have this question before the Court. Let us determine whether or not the statement was made. If it was, what would the damage be? What should we do? He has now been transferred out. I mean, it is true that under constitutional law, any violation entitles someone to a damage, but at best it would be nominal damages of $1. This case should not be remanded because in many courts, in the third, the second, and the sixth, if you can show that the result would have been the same with or without the statement that is in question, or the adverse action, then you can still deny relief. Now in Bruce v. Yilst, the Ninth Circuit takes a more ad hoc approach, and we asked this Court to adopt that same approach. Let's look at the totality of circumstances. Did Officer Drain have the ability to engage in this type of administrative segregation placement? Clearly not. It took two individuals. Had he shown any proclivity to doing that? No, he had shown the opposite. Does the record show that in prior instances where inmates had filed grievances against him, he nonetheless treated them fairly? Yes, it does. When we take all of that into account, and let's remember, he had been in administrative segregation for a significant period of time before this alleged comment was made. It's not like it was the triggering event. I think that the best rule of law, the best application of the threat adverse action principle is this. Let us look at the totality and entirety of the events and then make a ruling. I have a brief amount of time. Counsel, I know your time was almost up, but assuming that we get to the question of qualified immunity. Yes. We know that he can't get monetary damages. But couldn't he still obtain declaratory or injunctive relief? In Bruce v. Yilst, they addressed that precise question, and they decided that it would not be appropriate to have declaratory relief because, and this was at page 1289, dealing with the Black Gorilla family and the Institute of Gang Investigations. They stated, but if, in fact, the defendants abused the gang validation procedure as a cover or a ruse to silence and punish Bruce because he had filed grievances, they cannot assert that Bruce's validation served a legitimate penological purpose. And then they stated at 1290, the prison cannot be foreclosed from using the same evidence in the future in connection with his continuing imprisonment. That citation at page 1290 was in specific reference to the question of what we should do in terms of damages, and they rejected the allowance of declaratory relief because they don't want to foreclose the prison from using the same evidence if they have to in the future. Your Honors, it's been a privilege. My time is up. Thank you very much. Thank you. May it please the Court. I'd like to say a couple things in rebuttal. First, as to Drain's motive and the fact that it only lasted 10 days, my client filed a prison grievance against his stepson. The mere fact that this prison grievance was relieved or looked into and nothing was found doesn't mean that Drain's motive just suddenly disappeared. I mean, his anger and the threat was because it was against his stepson, just because the prison... So what are the consequences, then? The consequences of the threat or... What was the play out? He was already in administrative segregation. Yeah, and that would be my second point, Your Honor. We're not talking... I fully concede that my client was placed in administrative segregation for the right reasons. The question is, is why did he stay there for so long? The prison official, Drain, came up to him, threatened him, and then he stayed there for three years. And my opponent suggests that there's some sort of keys to freedom argument here, that my client somehow was able to... My client was... I'm over time. Go ahead. Finish your answer. My client stayed there for such a long time, and supposedly he had the ability to go get himself out. I mean, that's basically saying that we're allowed to violate prisoners' constitutional rights, and then he, if he has the ability to go talk to somebody about it and get himself out, that relinquishes any responsibility by the parties that were infringing on these constitutional rights. It just doesn't make sense to me how my client can be stuck in administrative segregation for the wrong reasons, and simply because there's some random supposed administrative guidelines that could possibly get him out, he should bear the responsibilities of this. My time is up, and thank you for your time. Thank you. All counsel were very excellent advocates today. Good start for our day. So congratulations to you all. Case argued as submitted. Not yet. Ha, ha, ha, ha, ha, ha, ha, ha, ha, ha, ha, ha, ha, ha! All right, the next ...
judges: Nelson, Fisher, Christen